UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

Thomas Gantt Jr.,

                              Plaintiff,                    **20 Civ. 8103 (PED)**

          - *against* -                                     <u>**DECISION AND
                                                            ORDER**</u>

Kilolo Kijakazi,[1]
*Acting Commissioner of the Social Security Administration*

                              Defendant.

**PAUL E. DAVISON, U.S.M.J.:**

## I.  INTRODUCTION

Plaintiff Thomas Gantt, Jr. brings this action pursuant to 42 U.S.C. § 405(g) challenging the decision of the Acting Commissioner of the Social Security Administration (the "agency") denying his application for Disability Insurance Benefits ("DIB"). [Dkt. 5.] Plaintiff filed a motion for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c) seeking to reverse the Acting Commissioner's decision that Plaintiff was not disabled within the meaning of the Social Security Act, 42 U.S.C. §§ 423 *et seq*., and to remand the matter for further administrative proceedings. [Plaintiff's Motion at Dkt. 29; Memorandum of Law at Dkt. 29-1; Reply in Support at Dkt. 31.] The agency filed a cross-motion for judgment on the pleadings to affirm the Acting Commissioner's decision and to dismiss this action. [Defendant's Motion at Dkt. 32; Memorandum of Law at Dkt. 30-1.] For the reasons that follow, Plaintiff's motion is **DENIED**, and the Acting Commissioner's motion is **GRANTED**.

_____

[1] Kilolo Kijakazi became the Acting Commissioner on July 9, 2021.  She is substituted for the former Commissioner, Andrew Saul, Pursuant to Fed. R. Civ. P. 25(d).  No further action is required to continue this action.  42 U.S.C. § 405(g).

## II.  BACKGROUND

Plaintiff is a former porter who was involved in a bus accident on June 21, 2017. [R. 14.] Plaintiff claims that as a result of this bus accident he was disabled due to a back and neck injury. [*Id.*][2]

### A.  Procedural History

On January 22, 2018, Plaintiff filed for Supplemental Security Income alleging disability due to a back and neck injury. [Application at R. 152-56.] Plaintiff's application was denied and he requested a hearing before an Administrative Law Judge ("ALJ").  [Denial at R. 18-86; Request for ALJ Hearing at R. 87.]  A video hearing was held on June 4, 2019 before ALJ Deanna Sokolski. [R. 31.][3] Plaintiff appeared with counsel and testified at the hearing. [R. 28-71.] On July 23, 2019, the ALJ issued a written decision in which she concluded that plaintiff was not disabled within the meaning of the SSA and denied Plaintiff's application. [R. 7-24.] The ALJ's decision became the Acting Commissioner's final decision on July 29, 2020 when the Appeals Council denied Plaintiff's request for review. [R. 1-6.] Plaintiff timely commenced this action on September 30, 2020. [Dkt. 1.]

### B.  The Medical Evidence

On June 22, 2017, Plaintiff went to the emergency room at Harlem Hospital Center where he complained of back and neck pain. [R. 240-41.] Plaintiff reported that he had been in a bus

---

[2] Notations preceded by "R." refer to the certified administrative record of proceedings relating to this case submitted by the Commissioner in lieu of an answer.  [Dkt. 24.] The Court conducted a plenary review of the entire administrative record, familiarity with which is presumed.  In light of plaintiff's narrow challenge to the ALJ's decision, I assume knowledge of the facts surrounding plaintiff's medical treatment and do not recite them in detail, except as germane to the analysis set forth below.

[3] Plaintiff appeared in New York; ALJ Sokolski presided over the hearing from Chicago, Illinois. [R. 31.]

accident where the bus was struck by a truck and as a result Plaintiff "lurched forward and struck the back of the [seat] in front of him." [R. 240.] The exam revealed that Plaintiff's neck was supple with left side scalenius and trapezius muscle tenderness. [R. 241.] The exam also noted that there was minimal midline tenderness and that the back spine in midline was not tender and that there was no gibbus or lateral deviation. [R. 241.] Plaintiff was prescribed Robaxin and given a soft collar. [R. 241.]

On August 3, 2017, Plaintiff met with Dr. Gabriel L. Dassa, D.O. [R. 376.] Dr. Dassa examined Plaintiff's left shoulder and left knee and observed that the range of motion in both was limited. [R. 377.][4] Dr. Dassa noted that Plaintiff's disability status was "[t]emporary total" and recommended that Plaintiff obtain an MRI of his left shoulder and left knee. [R. 377-78.]

Plaintiff obtained an MRI of his left shoulder, left knee, cervical spine, and lumbar spine from Lenox Hill Radiology on August 21, 2017. [R. 396, 399, 401, 403.] The MRI of Plaintiff's cervical spine revealed that there was a "central herniation with anterior thecal sac impingement" between the C5 and C6 vertebrae. [R. 397.] The MRI further revealed that there was a "disc bulge with anterior thecal sac impingement" between the C4 and C5 vertebrae. [R. 397.] The MRI of Plaintiff's lumbar spine revealed that between the L5 and S1 vertebrae, there was a "broad-based disc herniation with severe bilateral forminal stenosis" and that anterior thecal sac impingement was present. [R. 399.] It further revealed that there was a "central herniation with a central annular tear" between the L4 and L5 vertebrae and that there was anterior thecal sac impingement. [R. 399.] The MRI of Plaintiff's left knee revealed an "intermediate to high-grade

_____

[4] For his left shoulder, Plaintiff had a flexion of 145/170 degrees, an abduction of 135/170 degrees, an internal rotation of 35/60 degrees, an external rotation of 40/90 degrees, an extension of 15/30 degrees, and an adduction of 25/40 degrees. [R. 377.]  For his left knee, Plaintiff had a flexion of 115/140 degrees. [R. 377.]

chondromaiacia along with medial patelllar facet with subchondral marrow edema" and a "[b]one contusion of the medial femoral condyle." [R. 401.] The MRI of the Plaintiff's left shoulder revealed an "intermediate grade partical-thickness articular surface tear of the posterior fibers of the infraspinatus tendon" and a "[l]ow-lying acromion." [R. 403.]

After the MRI, Plaintiff met with Dr. Dassa on August 31, 2017. [R. 391.] Dr. Dassa observed the MRIs of the left shoulder and left knee and explained them to Plaintiff. [R. 391.] Dr. Dassa again observed that Plaintiff had a reduced range of motion in his left shoulder and left knee. [R. 391-92.][5] Dr. Dassa's recommendations noted that Plaintiff was a candidate for arthoscopic surgery, if his left shoulder did not respond to conservative treatment. [R. 392.]

On September 4, 2017, Plaintiff returned to the emergency room at Harlem Hospital Center, reporting "neck pain and leg tingling." [R. 234.] Plaintiff had a negative straight-leg test. [R. 235.] Plaintiff was discharged with Toradol and methocarbamol as well as a prescription for naproxen and baclofen. [*Id.*]

On October 2, 2017, Plaintiff had a consultation with Dr. Joshua Auerbach, M.D. [R. 434.] Plaintiff indicated that he has immediate onset of pain in his lower back, down his legs, and "also neck pain with left-sided arm pain with numbness and tingling." [*Id.*] Dr. Auerbach noted that Plaintiff's range of motion was limited in his spine. [*Id.*] Plaintiff's cervical spinal flexion was 40/50 extension and his axial rotation to the left was 35/80 and to the right was 40/80. [*Id.*] Plaintiff's lumbar spine truncal flexion was 70/90 and extension was 25/30. [*Id.*]  Dr. Auerbach observed that Plaintiff had a positive straight leg raise on the left side and a negative straight leg

---

[5] For his left shoulder, Plaintiff had a flexion of 150/170 degrees, an abduction of 145/170 degrees, an internal rotation of 40/60 degrees, an external rotation of 45/90 degrees, an extension of 20/30 degrees, and an adduction of 30/40 degrees. [R. 391.]  For his left knee, Plaintiff had a flexion of 120/140 degrees. [R. 392.]

raise on the right side. [*Id.*] Dr. Auerbach noted the MRI of Plaintiff's cervical spine and lumbar spine and observed the injury to Plaintiff's spine. [*Id.*] Dr. Auerbach also noted that Plaintiff's motor exam was 5/5. [*Id.*] Dr. Auerbach recommended proceeding with an anterior cervical fusion surgery of the C5 and C6 vertebrae. [435]

On October 30, 2017, Plaintiff had a follow-up appointment with Dr. Dassa. [R. 379.] Plaintiff stated that he was experiencing persistent pain and burning and Dr. Dassa noted that he was scheduled for cervical spine surgery on November 2, 2017. [*Id.*] Dr. Dassa again noted the limited range of motion in Plaintiff's left shoulder. [*Id.*][6] Dr. Dassa discussed arthoscopic surgery on Plaintiff's left shoulder with Plaintiff and Plaintiff indicated that he wanted to proceed with the surgery after his cervical spine surgery. [R. 380.]

On November 13, 2017, Plaintiff met with Dr. Auerbach in which he indicated that he has "significant pain in the neck." [R. 271.] Dr. Auerbach noted that Plaintiff wanted to try injections before resorting to surgery. [*Id.*]

On December 11, 2017 and December 22, 2017, Plaintiff met with Dr. Dassa. [R. 382-86.] At both appointments, Dr. Dassa observed Plaintiff's range of motion in his left shoulder, which was identical to his range of motion on October 30, 2017. [R. 382, 385.] At both appointments, Plaintiff stated that he did not wish to proceed with the cervical spine surgery. [R. 382.] At the December 22nd appointment, Plaintiff indicated that he would like to proceed with the arthroscopic surgery on his left shoulder, and Dr. Dassa noted that he would be sent for preoperative once he had been cleared. [R. 386.]

On January 8, 2018, Plaintiff met with Dr. Alexandru Burducea, D.O. for treatment of his

---

[6] For his left shoulder, Plaintiff had a flexion of 145/170 degrees, an abduction of 140/170 degrees, an internal rotation of 40/60 degrees, an external rotation of 60/90 degrees, an extension of 15/30 degrees, and an adduction of 25/40 degrees. [R. 379.]

severe pain. [R. 302.] Dr. Burducea observed that Plaintiff's cervical spine had "spasms and tenderness over C1 to C7 transverse processes." [*Id.*] Dr. Burducea further noted that Plaintiff had a positive facet loading test and a positive Spurling test. [R. 302.][7] Dr. Burducea also observed that Plaintiff's lubrosacral spine had "lordosis and tenderness over L1 to L5 transverse processes." [*Id.*] He further observed that Plaintiff's cervical spine flexion was 50 degrees, the extension was 10 degrees, the left lateral bending was 10 degrees, the right lateral bending was 10 degrees, the left rotation was 15 degrees, and the right rotation was 15 degrees. [*Id.*] Dr. Burducea also stated that Plaintiff had a positive straight leg test on the left at 30 degrees and on the right at 45 degrees. [*Id.*]  Plaintiff indicated that he wanted to proceed with a "bilateral L4-L5 and right L5-S1 transforaminal epidural steroid injection as well as cervical epidural steroid injection." [*Id.*] On January 15, 2018, Plaintiff received a cervical steroid injection. [R. 304.]

On January 22, 2018, Plaintiff had an appointment with Dr. Auerbach. [R. 270.] Dr. Auerbach noted that Plaintiff had "persistent neck pain and radiating arm pain down the arms with numbness and tingling despite conservative measures." [*Id.*] Dr. Auerbach recommended Plaintiff receive an updated MRI because Plaintiff had worsening pain, and that they would tentatively schedule Plaintiff's cervical spine surgery after the MRI. [*Id.*]

Plaintiff met with Dr. Auerbach again on February 5, 2018. [R. 269.] Dr. Auerbach noted that an MRI of Plaintiff's "cervical spine done at Bronx Lebanon demonstrates that C5/C6 disk bulge with superimposed central disk herniation producing mild central canal stenosis and bilateral foraminal stenosis." [*Id.*] He further noted Plaintiff would have his shoulder surgery that week and that after he recovered from shoulder surgery, he would tentatively get Plaintiff "back

---

[7] Dr. Burducea also observed that Plaintiff's bilateral biceps were 1/4, his bilateral triceps were 2/4, his bilateral brachioradialis was 2/4, and that his bilateral flexion of the biceps decreased to 4/5. [R. 302.]

on schedule to treat his cervical neck and radiating arm pain." [*Id.*]

On February 13, 2018, Plaintiff met with Dr. John Fkiaras, M.D. [R. 283.] Plaintiff was referred to Dr. Fkiaras by the Division of Disability Determination for an internal medicine examination. [*Id.*] Dr. Fkiaras observed that Plaintiff's cervical spine flexion/extension was 25 degrees, his cervical spine rotation was 20 degrees to the right and left, his lateral flexion to the right was 15 degrees to the right and 0 degrees to the left. [R. 285.] Dr. Fkiaras further observed that there was a +3 spasm of the cervical spine, and +3 spasm of the bilateral trapezius muscles. [*Id.*] He noted that Plaintiff's lumbar spine flexion was 45 degrees, his lateral flexion bilaterally was 25 degrees, and his lumbar rotation was 25 degrees bilaterally. [*Id.*] He also noted that there was pain to palpation of the lumbar spine and that Plaintiff's straight leg test was negative bilaterally. [*Id.*] Dr. Fkiaras concluded that:

> The [Plaintiff] has a marked limitation lifting, carrying, pushing, pulling, squatting, kneeling, crouching, and bending. The [Plaintiff] has a marked limitation reaching with the left upper extremity. The [Plaintiff] at this time has moderate to marked schedule disruptions.  The [Plaintiff] has a moderate to marked limitation standing extended periods.  The [Plaintiff] moderate to marked limitation sitting for extended periods.  The [Plaintiff] has a marked limitation driving and operating machinery. The [Plaintiff] has a marked limitation for tasks which require exposure to unprotected heights.  The [Plaintiff] has a marked limitation for looking left and right and up and down.

[R. 286-87.]  Dr. Fkiaras also observed that Plaintiff walked with a slow gait, could walk on his heels and toes without difficulty, could squat 1/5 of the way down, that he did not use assistive devices, that he needed no help changing for the exam or getting on and off the exam table, and that he was able to rise from a chair without difficulty. [R. 284.] He stated that Plaintiff had intact hand and finger dexterity and a 5/5 bilateral grip strength. [R. 286.] He  further observed that there was "[n]o muscle atrophy evident." [*Id.*] He requested an x-ray of Plaintiff's left knee

and cervical spine. [*Id.*] Two days later, on February 15, 2018, Plaintiff had the x-ray on his cervical spine and his left knee. [R. 288-89.] The x-ray of Plaintiff's cervical spine revealed that there was "moderate disc space narrowing at C2-C3 and C3-C4" and that there was "no definite compression fracture." [R. 288.] The x-ray of the left knee revealed "no evidence of acute fracture, dislocation or destructive bony lesion." [R. 289.]

On February 16, 2018, Plaintiff had a follow-up appointment with Dr. Dassa to evaluate the status of Plaintiff's left shoulder after his arthoscopic surgery on February 7, 2018. [R. 387.] She observed that Plaintiff's shoulder was "doing well" post-surgery. [R. 387.]

On February 26, 2018, Plaintiff received a lumbar epidurogran and tranforaminal epidural steroid injection at the right and left L4-5 from Dr. Burducea. [R. 299.] A week later, on March 5, 2018, Plaintiff had an appointment with Dr. Burducea. [R. 296.] Dr. Burducea again observed that Plaintiff's cervical spine had "spasms and tenderness over C1 to C7 transverse processes." [*Id.*] Dr. Burducea also observed that Plaintiff had a positive facet loading test and a positive Spurling test. [*Id.*][8] Plaintiff's cervical spine testing was identical to the previous appointment. [*Id.*] Dr. Burducea further noted that Plaintiff's lubrosacral spine had "lordosis and tenderness over L1 to L5 transverse processes." [*Id.*] Based on Plaintiff's response to the first injections, Dr. Burducea recommended a second cervical epidural steroid injection and a second transforaminal epidural steroid injection. [R. 297.]

On March 7, 2018, Plaintiff was evaluated by Dr. A. Saeed, M.D., a state agency medical consultant. [R. 75.] Dr. Saeed noted that listing 1.04 was among the listings considered. [*Id.*] Dr.

---

[8] The results from Plaintiff's bilateral testing was identical to the previous appointment with Dr. Burducea. [R. 296.]

Saeed noted that Plaintiff could squat 1/5th of the way down, his cervical spine flexion/extension was 25 degrees, his rotation to the left and right was 20 degrees, his cervical spine lateral flexion to the right was 15 degrees, his cervical spine lateral flexion to the left was 0 degrees. [R. 77.] Dr. Saeed also observed that Plaintiff had a +3 spasm of the cervical spine, and +3 spasm of the bilateral trapezius muscles. [*Id.*] Dr. Saeed further noted that Plaintiff's lumbar spine flexion was 45 degrees, his lateral flexion bilateral of his lumbar spine was 25 degrees, and his lumbar spine rotation was 25 degrees. [*Id.*] Based on these and other findings, Dr. Saeed determined that Plaintiff was not disabled. [R. 79.]

On March 29, 2018, Plaintiff had anterior cervical discectomy with fusion surgery on his C5 and C6 vertebrae. [R. 452-54.] As part of the surgery, a cortical and cancellous structual allograft was placed inside Plaintiff. [R. 455.]  After surgery, Plaintiff then had a series of follow-up appointments with Dr. Auerbach to monitor his post-surgery progress. On April 9, 2018, Dr. Auerbach noted that Plaintiff has no further pain down his arms. [R. 313.] He further noted that Plaintiff had some neck pain and stiffness, but that such pain was expected. [*Id.*] Dr. Auerbach also observed that Plaintiff had a 5/5 on his motor exam throughout the bilateral upper extremities. [*Id.*] On May 7, 2018, Plaintiff met with Dr. Auerbach again. [R. 316.] Dr. Auerbach noted that Plaintiff had no further pain down the arms, just neck pain and stiffness. [*Id.*] Dr. Auerbach also noted that Plaintiff again had a 5/5 on his motor exam. [*Id.*] Dr. Auerbach took an x-ray that showed that the implants were in an "excellent position at C5-6 with nicely incorporating bone graft." [*Id.*]

On June 4, 2018, Plaintiff had an appointment with Dr. Dassa. [R. 389.] Dr. Dassa stated that Plaintiff had been receiving physical therapy and that Plaintiff wanted to continue because it

provided "him relief of pain." [R. 389.] Dr. Dassa also observed Plaintiff's limited range of

motion in his left shoulder. [R. 389.][9]  Dr. Dassa recommended that Plaintiff continue with

physical therapy. [R. 390.]

Plaintiff continued to see Dr. Auerbach to monitor his post-surgery progress.  On June 11,

2018, Dr. Auerbach observed that Plaintiff no longer had any further pain down the arm but had

neck pain.  [R. 317.] Dr. Auerbach further observed that Plaintiff's axial rotation was 60/80 to

the right and 55/80 to the left, and that his cervical flexion was 30/50 and extension was 20/60.

[*Id.*] Dr. Auerbach also noted that Plaintiff's motor is 5/5 throughout the bilateral extremities.

[*Id.*] Dr. Auerbach observed that Plaintiff needed to do additional physical therapy. [*Id.*] On

September 18, 2018, Dr. Auerbach noted that Plaintiff had "some neck discomfort" but that

Plaintiff's "radiating arm pain numbness and tingling" were gone. [R. 320.] Dr. Auerbach further

observed that Plaintiff's axial rotation was 60/80 to the left and 65/80 to the right. [*Id.*]  On

December 18, 2018, Dr. Auerbach stated that Plaintiff still had "some neck pain that is

bothersome" and noted that Plaintiff did some therapy but had not had any recent injections. [R.

323.] Dr. Auerbach also took an x-ray of Plaintiff's neck and noted that the "implants were in a

good position." [*Id.*] In light of Plaintiff's neck pain, Dr. Auerbach recommended "a trial of

trigger point injections versus facet blocks[.]" [*Id.*]

On January 4, 2019, Plaintiff had an appointment with Dr. David Gutierrez, M.D. [R.

295.] Dr. Gutierrez observed that Plaintiff's cervical spine had a "decreased range of motion in

all planes." [R. 294.] Dr. Gutierrez also observed that Plaintiff's manual muscle testing reveals

---

[9] Plaintiff's left shoulder had a flexion of 155/170 degrees, an abduction of 150/170 degrees, an internal rotation of 45/60 degrees, an external rotation of 70/90 degrees, an extension of 20/30 degrees, and an adduction of 30/40 degrees. [R. 389.]

grossly 5/5 throughout the bilateral upper extremities and grossly 5/5 throughout the bilateral lower extremities. [*Id.*] Dr. Gutierrez noted that Plaintiff's "[l]umbar spine exhibits reproducible radicular pain with straight leg raise testing." [*Id.*] Dr. Gutierrez's impression was that plaintiff had intervertebral disc disorder and recommended that Plaintiff "start a neuropathic pain agent to address the numbness and tingling particularly in his lower extremities but also status post previous [cervical spine surgery]." [R. 295.]

On January 7, 2019, Plaintiff met with Ronald Cobbs, M.D. at Harlem Hospital Center to monitor Plaintiff's treatment plan. [R. 347.] Plaintiff was in chronic pain and had pins down both legs. [R. 348.]  Dr. Cobbs reviewed x-rays of Plaintiff's cervical spine and noted that the surgical hardware appeared intact and that there was "no evidence of fracture or spondylolisthesis." [*Id.*]

On May 9, 2019, Plaintiff had another appointment with Dr. Auerbach. [R. 482.] Dr. Auerbach noted that Plaintif had "no further arm pain" but that he did have some neck pain and stiffness. [*Id.*] Dr. Auerbach observed that Plaintiff's axial rotation was 60/80 to the right and 50/80 to the left, and that his cervical flexion was 30/50 and his extension was 40/60. [*Id.*] Dr. Auerbach further observed that Plaintiff's motor was 5/5 throughout the bilateral upper extremity. [*Id.*] Dr. Auerbach also noted that Plaintiff "has healed fusion C5-C6 with resolved cervical radicular pain but with persistent axial neck pain and reflux which is becoming a little bit more bothersome to him." [*Id.*] Plaintiff was to follow-up with Dr. Auerbach in three to six months. [*Id.*]

## C.    Plaintiff's Hearing Testimony[10]

---

[10]  Vocational expert Heather Mueller also testified at the hearing. [R. 62-69.]  Her testimony is not germane to the issues before the Court.

Plaintiff was born on September 24, 1972 and he was 46 years old at the time of the hearing. [R. 36.] Plaintiff was five feet and six inches and he weighed 210 pounds at the time of the hearing. [*Id.*] He completed up until a 10th grade education and later completed his GED. [R. 36-37.] In 2012, Plaintiff worked as a porter at Wildcat Service where he performed maintenance at Men's Bellevue Shelter in downtown Manhattan. [R. 40.] After Wildcat Service, Plaintiff worked for WHGA Garvey Housing Development, and later the West Harlem Group Assistance. [R. 158.] Plaintiff was a porter at both of these positions. [R. 40.] At the West Harlem Group Assistance, Plaintiff had five buildings where he had to "sweep all walkups, sweep the buildings, clean the windows, [and] clean the backyard." [R. 38.] If there were vacant apartments Plaintiff would move the old furniture and bring in new furniture. [R. 39.] He estimates that he carried between 40 and 50 pounds in this position. [*Id.*] Prior to his accident, Plaintiff was working as a porter for Metropolitan Realty Group LLC. [R. 159.]

Plaintiff testified that he was in a bus accident. [R. 42-43.] He further testified that he has constant pain in his neck and that he cannot sit or stand long without his neck going numb. [R. 42.] Plaintiff stated that he could not stand or sit for more than 15 to 20 minutes without his legs going numb and needing to change position. [R. 45.] He also stated that he could only walk a block before he would need to sit or lie down. [R. 46.] He testified that over an eight-hour period he could not stand all day, and would only be able to stand for an hour total. [R. 50-51.] He further stated that he could not carry more than three pounds. [R. 46.] Plaintiff testified that he usually spends his day on his iPad or watching CNN. [R. 52.] He stated that he does not need assistance with personal care, but his girlfriend does the chores around the house. [R. 53.]

Plaintiff testified that the numbness in his arms was resolved with his shoulder surgery,

but that he still experiences pain in his neck and numbness in his lower back and legs. [R. 47.]

Plaintiff stated that he chose not to have surgery on his back because he is scared about the

impact it will have. [R. 48.] Plaintiff takes gabapentin, meloxicam, and cyclobenzaprine. [R. 50-

51.] He states that the medication helps relieve the pain but it also makes him very sleepy. [R.

51.]

**D.    The ALJ's Decision**

At the first step of the sequential analysis, the ALJ determined that Plaintiff had not

engaged in substantial gainful activity since January 22, 2018, Plaintiff's application date.  [R.

12.] At the second step, the ALJ determined that Plaintiff had the following severe impairments:

lumbar and cervical spine degenerative disc disease; and obesity. [*Id.*] At the third step, the ALJ

found that Plaintiff's impairments did not meet or medically equal the severity of one of the

listed impairments in the Adult Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix

1.  [R. 13.] The ALJ noted that Plaintiff's representative argued that Plaintiff met listing 1.04, but

concluded that the "record does not contain evidence of spinal arachnoiditis or evidence that the

claimant has an inability to ambulate effectively, as defined in 1.00B2b." [*Id.*] To support this

decision, the ALJ referenced the consultative examination report of Plaintiff on February 13,

2018. [*Id.*]

At step four, the ALJ concluded that plaintiff has the residual functional capacity ("RFC")

to perform sedentary work (as defined in CFR 404.1567(a)),

> except the claimant can never climb ladders, ropes, or scaffolds; can occasionally
> climb ramps and stairs; can occasionally balance, stoop, kneel, crouch, and crawl;
> can occasionally reach overhead with the bilateral upper extremities; can
> occasionally push and pull and operate foot controls with the bilateral lower
> extremities; must avoid all exposure to workplace hazards, such as unprotected

heights, dangerous moving machinery, and uneven ground; and would need to be able to sit and stand at will.

[R. 13.] To reach this conclusion, the ALJ considered "all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence " in accordance with 20 C.F.R. § 416.929 and Social Security Ruling 16-3p. [R. 14.] The ALJ also found that Plaintiff is unable to perform any past relevant work. [R. 19.]

At step five, in light of the vocational expert's testimony, the ALJ determined that Plaintiff "there are jobs that exist in significant numbers in the national economy that the claimant can perform." [R. 20.] Thus, the ALJ found plaintiff "not disabled" as defined in the SSA. [R. 21.]

### III.   LEGAL STANDARDS

### A.   Standard of Review

In reviewing a decision of the Commissioner, a district court may "enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). "It is not the function of a reviewing court to decide de novo whether a claimant was disabled." *Melville v. Apfel*, 198 F.3d 45, 52 (2d Cir. 1999). Rather, the court's review is limited to "determin[ing] whether there is substantial evidence supporting the Commissioner's decision and whether the Commissioner applied the correct legal standard." *Poupore v. Astrue*, 566 F.3d 303, 305 (2d Cir. 2009) (per curiam).

The substantial evidence standard is even more deferential than the "clearly erroneous" standard. *Brault v. Social Sec. Admin*, 683 F.3d 443, 448 (2d Cir. 2012). "Even where the administrative record may also adequately support contrary findings on particular issues, the

14

ALJ's factual findings must be given conclusive effect so long as they are supported by substantial evidence." *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) (per curiam). "The substantial evidence standard means once an ALJ finds facts, we can reject those facts only if a reasonable factfinder would *have to conclude otherwise*." *Brault*, 683 F.3d at 448 (internal quotations omitted).

"Substantial evidence" is "more than a mere scintilla" and "means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Lamay v. Commissioner of Soc. Sec.*, 562 F.3d 503, 507 (2d Cir. 2009) (internal quotations omitted) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). "In determining whether the agency's findings are supported by substantial evidence, the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn." *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012) (internal quotations omitted). "When there are gaps in the administrative record or the ALJ has applied an improper legal standard," or when the ALJ's rationale is unclear in light of the record evidence, remand to the Commissioner "for further development of the evidence" or for an explanation of the ALJ's reasoning is warranted. *Pratts v. Chater*, 94 F.3d 34, 39 (2d Cir. 1996).

**B.      Statutory Disability**

The Social Security Act ("SSA") defines the term "disability to mean the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A). In addition, a person is eligible for disability benefits under the SSA only if

his physical or mental impairment or impairments are of such severity that he is
not only unable to do his previous work but cannot, considering his age,
education, and work experience, engage in any other kind of substantial gainful
work which exists in the national economy, regardless of whether such work
exists in the immediate area in which he lives, or whether a specific job vacancy
exists for him, or whether he would be hired if he applied for work.

*Id.* § 423(d)(2)(A).

Social Security Regulations set forth a five-step sequential analysis for evaluating

whether a person is disabled under the SSA:

(1) whether the claimant is currently engaged in substantial gainful activity;
(2) whether the claimant has a severe impairment or combination of impairments;
(3) whether the impairment meets or equals the severity of the specified
impairments in the Listing of Impairments;
(4) based on a "residual functional capacity" assessment, whether the claimant
can perform any of his or her past relevant work despite the impairment; and
(5) whether there are significant numbers of jobs in the national economy that the
claimant can perform given the claimant's residual functional capacity, age,
education, and work experience.

*McIntyre v. Colvin*, 758 F.3d 146, 150 (2d Cir. 2014) (citing 20 C.F.R. §§ 404.1520(a)(4)(I)-(v),

416.920(a)(4)(I)-(v)). The claimant bears the burden of proof for the first four steps of the

process. *See Burgess v. Astrue*, 537 F.3d 117, 120 (2d Cir. 2008). If the claimant proves that his

impairment prevents him from performing his past work, the burden then shifts to the

Commissioner at the fifth and final step. *See Brault*, 683 F.3d at 445.

## C.     Weighing the Medical Evidence

On January 18, 2017, the Commissioner published the "Revisions to Rules Regarding the

Evaluation of Medical Evidence," effective March 27, 2017.  82 Fed. Reg. 5844-01, 2017 WL

168819 (Jan. 17, 2017). The Revisions altered certain longstanding rules for evaluating medical

opinion evidence for cases filed after March 27, 2017. *Id*. at *5844. "Under the new regulations,

16

a treating doctor's opinion is no longer entitled to a presumption of controlling weight." *Prieto v. Comm'r of Soc. Sec.*, 2021 WL 3475625, at *8 (S.D.N.Y. Aug. 6, 2021). Instead, all medical opinions must be evaluated for their persuasiveness based on: (1) supportability; (2) consistency; (3) the medical source's relationship with the claimant; (4) the medical source's specialization; and (5) other relevant factors. 20 C.F.R. §§ 404.1520c(a)-(c).

The ALJ must provide an explanation for the factors of supportability and consistency, because these factors are the most important. *See Byrd v. Kijakazi*, 2021 WL 5828021, at *15 (S.D.N.Y. Nov. 12, 2021). As to supportability, "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical findings(s), the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." 20 C.F.R. § 404.1520c(c)(1). As for consistency, "[t]he more consistent a medical opinion(s) or prior administrative finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." *Id.* at § 404.1520c(c)(2).

"An ALJ must not only consider supportability and consistency in evaluating medical source opinions but also must explain the analysis of those factors in the decision." *Prieto*, 2021 WL 3475626, at *9.  *See* 20 C.F.R. § 404.1520c(b)(2). Further, in most instances, an ALJ must "consider, but need not explicitly discuss, them in determining the persuasiveness of the opinion of a medical source." *Byrd*, 2021 WL 5828021, at *16. "If the ALJ finds two or more medical opinions to be equally supported and consistent with the record, but not identical, the ALJ must articulate how he or she considered those three remaining factors." *Id.* (citing 20 C.F.R. §§

404.1520c(b)(3), 416.920c(b)(3)).

## IV.  DISCUSSION

Plaintiff challenges the ALJ's decision on two grounds.  First, Plaintiff alleges that the ALJ erred in determining that Plaintiff's cervical and lumbar impairments did not satisfy Listing 1.04A. [Dkt. 29-1, p. 11.] Second, Plaintiff argues that the ALJ improperly evaluated Dr. Fkiaras's opinion, and rejected Dr. Saeed's opinion, which resulted in the ALJ improperly relying on her own opinion. [*Id.* at 16] Defendant argues, in response, that the ALJ's decision is supported by substantial evidence, the ALJ properly determined Plaintiff did not satisfy Listing 1.04A, and the ALJ properly considered Dr. Fkiaras's opinion. [Dkt. 30-1.]

## B.    The ALJ Properly Determined that Plaintiff Does Not Satisfy Listing 1.04A

Plaintiff argues that the ALJ's analysis in determining that Plaintiff did not satisfy Listing 1.04A was "nonsensical" because Listing 1.04A does not require a finding of spinal arachnoiditis or a finding that Plaintiff has an inability to ambulate effectively. [Dkt. 29-1, p. 13.]

Plaintiff bears the burden in proving that he meets the Listing.  *See Burgess*, 537 F.3d at 128.  To satisfy this burden, Plaintiff must "meet all of the specified medical criteria. An impairment that manifests only some of those criteria, no matter how severely, does not qualify." *Perozzi v. Berryhill*, 287 F. Supp. 3d 471, 482 (S.D.N.Y. 2018) (quoting *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990)).

To satisfy the requirements of Listing 1.04, Plaintiff must show–in addition to a spinal disorder such as a herniated nucleus pulpous, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture–

A. Evidence of nerve root compression characterized by neuro-anatomic

distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine);
or
B. Spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once every 2 hours;
or
C. Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.04.

Here, the ALJ concluded that Plaintiff did not meet Listing 1.04 because the "record does not contain evidence of spinal arachnoiditis or evidence that the claimant has an inability to ambulate effectively, as defined in 1.00B2b." [R. 13.] The ALJ also cited the consultative examination conducted by Dr. Fkiaras on February 13, 2018, which noted that the Plaintiff was in "no acute distress," and that Plaintiff could "walk on heels and toes without difficulty, used no assistive devices, was able to rise from a chair without difficulty, [and] needed no help changing for the exam or getting on and off the exam table[.]" [*Id.*] The ALJ also noted that Dr. Fkiaras observed that Plaintiff "had clear lungs to auscultation, had a negative seated and supine straight leg raise test bilaterally, had no evident muscle atrophy, had no edema, had intact hand and finger dexterity, and had 5/5 grip strength bilaterally." [*Id.*]  Although the ALJ's conclusions may speak to sections B and C of Listing 1.04, nonetheless, "the absence of an express rationale for an ALJ's conclusions does not prevent us from upholding them so long as we are 'able to look to other portions of the ALJ's decision and to clearly credible evidence in finding that [her] determination

was supported by substantial evidence.'" *Salmini v. Comm'r of Soc. Sec.*, 371 F. App'x 109, 112 (2d Cir. 2010) (quoting *Berry v. Schweiker*, 675 F.2d 464, 469 (2d Cir. 1982)).

Here, the record contains substantial evidence to support the ALJ's conclusion that Plaintiff did not meet his burden at step three.  The first step to obtain relief under Listing 1.04A requires Plaintiff to show that he has a spinal disorder, such as herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture.  Substantial evidence shows that Plaintiff did indeed have a spinal disorder.  An MRI of the Plaintiff's cervical spine on August 21, 2017 revealed that there was a "central herniation with anterior thecal sac impingement" between the C5 and C6 vertebrae. [R. 397.] An MRI of Plaintiff's lumbar spine showed that between the L5 and S1 vertebrae, there was a "broad-based disc herniation with severe bilateral forminal stenosis" and that anterior thecal sac impingement was present. [R. 399.]  It further revealed that there was a "central herniation with a central annular tear" between the L4 and L5 vertebrae and that there was anterior thecal sac impingement. [*Id.*] A follow-up MRI observed by Dr. Auerbach on February 5, 2018 showed that Plaintiff's cervical spine "demonstrates that C5/C6 disk bulge with superimposed central disk herniation producing mild central canal stenosis and bilateral foraminal stenosis." [R. 269.] Notably, x-rays taken after Plaintiff's anterior cervical discectomy and fusion surgery, demonstrate that his implant was still intact. [R. 316, 323, 348.] The record does not indicate that there have been any MRIs taken post-surgery.  Although Plaintiff's cervical herniated disc may have been resolved, Plaintiff still has a herniated disc in his lumbar spine and there is no evidence on the record that demonstrates this was resolved.  As such, Plaintiff satisfies the first line of inquiry to obtain relief under Listing 1.04A.

Under the second line of inquiry, Plaintiff must satisfy all of the criteria established in Paragraph A. The first criteria is evidence of nerve root compression and the associated neuro-anatomic distribution of pain. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.04.A. The record demonstrates evidence of neuro-anatomic distribution of pain as Plaintiff complains of neck and back pain throughout the record. [R. 42, 47, 270, 285, 302,313, 316, 323, 333, 379, 434, 482.] There is also evidence that this pain is caused by a nerve root compression as MRIs revealed that there was a "disk bulge with superimposed central disk herniation" between Plaintiff's C5 and C6 vertebra, as well as "broad-based disk herniation" between the L5 and S1 vertebrae, and a "central herniation with a central annular tear" between the L4 and L5 vertebrae. [R. 269, 397, 399.]

The second criteria is that the Plaintiff has a "limitation of motion of the spine." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.04.A. The record shows that Plaintiff's spinal motion was indeed limited. On October 2, 2017, Dr. Auerbach noted that Plaintiff's cervical spinal flexion was 40/50 extension and his axial rotation to the left was 35/80 and to the right was 40/80. [R. 434.] He further noted that Plaintiff's lumbar spine truncal flexion was 70/90 and extension was 25/30. [*Id.*] On January 8, 2018, Dr. Burducea observed that Plaintiff's cervical spine flexion was 50 degrees, the extension was 10 degrees, the left lateral bending was 10 degrees, the right lateral bending was 10 degrees, the left rotation was 15 degrees, and the right rotation was 15 degrees. [R. 302.] Dr. Burducea observed identical findings on February 26, 2018. [R. 296.] On February 13, 2018, Dr. Fkiaras observed that Plaintiff's cervical spine flexion/extension was 25 degrees, his cervical spine rotation was 20 degrees to the right and left, his lateral flexion to the right was 15 degrees to the right and 0 degrees to the left. [R. 285.] Dr. Fkiaras also noted that Plaintiff's

21

lumbar spine flexion was 45 degrees, his lateral flexion bilaterally was 25 degrees, and his lumbar rotation was 25 degrees bilaterally. [*Id.*] On March 7, 2018, Dr. Saeed observed that Plaintiff's cervical spine flexion/extension was 25 degrees, his rotation to the left and right was 20 degrees, his cervical spine lateral flexion to the right was 15 degrees, his cervical spine lateral flexion to the left was 0 degrees. [R. 77.] Dr. Saeed also noted that Plaintiff's lumbar spine flexion was 45 degrees, his lateral flexion bilateral of his lumbar spine was 25 degrees, and his lumbar spine rotation was 25 degrees. [R. 77.] On June 11, 2018, Dr. Auerbach observed that Plaintiff's axial rotation was 60/80 to the right and 55/80 to the left, and that his cervical flexion was 30/50 and extension was 20/60. [R. 317.] Dr. Auerbach later observed, on September 18, 2018, that Plaintiff's axial rotation was 60/80 to the left and 65/80 to the right. [R. 320.]  On a more general observation, Dr. Gutierrez observed on January 4, 2019 that Plaintiff had a "decreased range of motion in all planes." [R. 294.] On May 9, 2019, Dr. Auerbach observed that Plaintiff's axial rotation was 60/80 to the right and 50/80 to the left, and that his cervical flexion was 30/50 and his extension was 40/60. [R. 482.] As such, there is some evidence that Plaintiff's range of motion in his spine was limited.

The third criteria is "motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.04.A. Plaintiff fails to meet this criteria.  Although there is some evidence of muscle weakness, there is no evidence of muscle atrophy.  Indeed, as the ALJ observed, Dr. Fkiaras's findings indicated that there was "[n]o muscle atrophy evident," and Plaintiff points to nothing on the record to contradict this finding. [R. 13, 286.] There is conflicting evidence concerning Plaintiff's muscle weakness.  There is evidence that Plaintiff indeed experienced muscle weakness, as his

appointments with Dr. Burducea on January 8, 2018 and March 5, 2018 include observations of Plaintiff's proximal and distal muscle weakness. [R. 296, 302.] Importantly though, none of these observations occur after Plaintiff's left shoulder surgery or his anterior cervical discectomy and fusion surgery.  There is also evidence to indicate that Plaintiff did not experience muscle weakness, as examinations by Dr. Auerbach on October 2, 2017, April 9, 2018, May 7, 2018, June 11, 2018, and May 3, 2019 observed that Plaintiff had 5/5 through the bilateral upper extremities. [R. 313, 316, 317, 434, 482.] An examination by Dr. Gutierrez on January 4, 2019  further supports this as he found that Plaintiff had a grossly 5/5 throughout the bilateral upper extremities and bilateral lower extremities. [R. 294.] Further, as the ALJ noted in reaching her conclusion that Plaintiff did not qualify for Listing 1.04A, Dr. Fkiaras's observations included that Plaintiff could walk on his heels and toes without difficulty, used no assistive devices, was able to rise from a chair without difficulty, needed no help changing for the exam, needed no assistance getting on or off the exam table, had intact hand and finger dexterity, and a 5/5 grip strength bilaterally. [R. 13, 284, 286.] This is substantial evidence that is sufficient to support the ALJ's determination that Plaintiff did not meet the third criteria for Listing 1.04A.

Finally, the last criteria is a "positive straight-leg raising test (sitting and supine)." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.04.A.  There is evidence that Plaintiff had positive straight-leg raising tests on October 2, 2017, January 8, 2018, and January 4, 2019. [R. 294, 302, 434.] There is also evidence that Plaintiff had negative straight-leg raising tests on September 4, 2017 and January 13, 2018. [R. 235, 285.] In concluding that Plaintiff did not meet the requirements of Listing 1.04A, the ALJ noted that Plaintiff had a negative seated and supine straight leg raise test bilaterally on January 13, 2018. [R. 13.] Although the evidence is conflicting, it seems the ALJ

relied upon the January 13, 2018 examination to conclude that Plaintiff does not meet this listing.

Plaintiff argues that he indeed meets the criteria for Listing 1.04A. [Dkt. 29-1, p. 11-16.] Specifically, Plaintiff argues that the ALJ did not consider the correct standards. *Id.* at 13. Although the ALJ referenced the criteria for Listing 1.04B and 1.04C, the substantial evidence and ALJ's findings nonetheless spoke to reasons to deny Listing 1.04A.  *See Gonzalez v. Saul*, 2020 WL 5550043, at *22 (S.D.N.Y. Sept. 16, 2020).  Accordingly, the ALJ did not err at step three.

**B.      The ALJ Properly Weighed The Medical Evidence**

Plaintiff argues that the ALJ erred in weighing the medical evidence because the ALJ improperly assessed Dr. Fkiaras's opinion, and rejected Dr. Saeed's opinion. [Dkt. 29-1, p. 16.] As a result, Plaintiff argues, the ALJ reached an impermissible RFC finding based on her own opinion. [Dkt. 29-1, p. 18.]

Plaintiff argues that the ALJ improperly assessed Dr. Fkiaras's opinion because the ALJ found Dr. Fkiaras's opinion "persuasive, as that opinion is supported by and consistent with the record," but also found it to be "vague with respect to the [Plaintiff's] function limitations (as Dr. Fkiaras does not specify what marked and moderate limitations entail) and finds the [Plaintiff] has the limitations in the above residual functional capacity." [Dkt. 29-1, p. 20; R. 18.] It is well-established in this Circuit that words such as "marked" and "moderate" are too vague for an ALJ to rely on without additional information.  *Curry v. Apfel*, 209 F.3d 117, 123 (2d Cir. 2000), *superseded by statute on other grounds, as recognized in Douglass v. Astrue*, 496 F. App'x 154, 156 (2d Cir. 2012) (summary order).  There is an exception to this rule, whereby such terms will not be considered too vague if "the facts underlying that opinion and the other medical opinions in

24

the record lend it a more concrete meaning." *Davis v. Massanari*, 2001 WL 1524495, at *8 (S.D.N.Y. Nov. 29, 2001); *see also Ashby v. Astrue*, 2012 WL 2477595, at *12 (S.D.N.Y. Mar. 27, 2012), *report and recommendation adopted*, 2012 WL 2367034 (S.D.N.Y. June 20, 2012).

Dr. Fkiaras did conclude that Plaintiff had certain "moderate" or "marked" restrictions, but his opinion contained a level of detail that lends his conclusions a more concrete meaning. Dr. Fkiaras's report included Plaintiff's medical and social history, a list of Plaintiff's medications, and a description of Plaintiff's ability to perform daily chores and activities. [R. 283-84.] Dr. Fkiaras also made direct observations as to Plaintiff's ability to walk, stand, squat, rise from his chair, and get on and off the examination table. [R. 284.] Dr. Fkiaras was particularly thorough with his examination of Plaintiff's musculoskeletal system, observing Plaintiff's spinal flexion, range of motion, and the strength and condition of Plaintiff's extremities. [R. 285.] In light of the detail in Dr. Fkiaras's opinion, although he used vague terms, such terms were supported by the facts underlying his opinion. *Davis*, 2001 WL 1524495, at *8.

Here, the ALJ appropriately acknowledged that Dr. Fkiaras's opinion contained vague terms with respect to Dr. Fkiaras's conclusions regarding Plaintiff's function limitations. [R. 18.] Nonetheless, the ALJ relied upon the factual details within Dr. Fkiaras's opinion to determine Plaintiff's RFC. [*Id.*] This included Dr. Fkiaras's observations that Plaintiff did not appear to be in any acute distress, could walk on his heels and toes without difficulty, did not use any assistive devices, was able to rise from a chair without difficulty, did not need help changing for the exam or getting on and off the exam table, had a negative straight leg raise test bilaterally, had no evident muscle atrophy, had intact hand and finger dexterity, and had 5/5 grip strength bilaterally. [*Id.*] As such, the ALJ did not err in handling Dr. Fkiaras's opinion.

Given that the ALJ appropriately assessed Dr. Fkiaras's opinion, it does not matter that the ALJ rejected Dr. Saeed's opinion.  An ALJ is allowed to decline to accept conclusions of a medical opinion when they are inconsistent with the rest of the record.  *Pellam v. Astrue*, 508 F. App'x 87, 89-90 (2d Cir. 2013).  Here, the ALJ found that Dr. Saeed's opinion was "not persuasive" because it conflicted with other parts of the record. [R. 17.] As such, the rejection of Dr. Saeed's opinion was appropriate.  Given that the ALJ did not mishandle Dr. Fkiaras's opinion and appropriately rejected Dr. Saeed's opinion, her RFC determination was not based on her own opinion but rather supported by substantial evidence.

## VI.  CONCLUSION

For the reasons set forth above, Plaintiff's motion for judgment on the pleadings is **DENIED** and Defendant's cross-motion for judgment on the pleadings is **GRANTED**. The Clerk of Court is directed to terminate the pending motions [Dkt. 29 and 32] and close this case.


Dated: January 25, 2022
       White Plains, New York

                                        **SO ORDERED**

                                        _____
                                        PAUL E. DAVISON, U.S.M.J.

26